In re the Marriage of: Rebecca Lynn Guelig,
Petitioner-Respondent,

v.

Timothy Gerard Guelig, Respondent-Appellant.

Court of Appeals

*No. 2005AP346. Submitted on briefs June 2, 2005.
—Decided August 31, 2005.*

2005 WI App 212

(Also reported in 704 N.W.2d 916.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Timothy R. Young* of *Dempsey, Williamson, Young, Kelly & Hertel, LLP* of Oshkosh.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *William K. McKibbage* of *McKibbage Law Office, S.C.* of Fond du Lac

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. This case presents us with the opportunity to review the proper procedures surrounding the parties' submission of parenting plans where the parents contest placement. Here, the court adopted the mother's parenting plan *in toto* because the father had not submitted his at the time of the scheduling conference. We hold that this was improper. First, the court should not have considered placement and custody issues when the father had not yet received a copy of the mother's proposal. Our statutes, as well as due process, contemplate such an exchange. Moreover, because we conclude that a scheduling conference is not a pretrial conference, the father did not waive his right to object to his wife's proposal when he failed to submit his own plan prior to the scheduling conference. Indeed, the father had no notice, statutory or otherwise, that the court might consider custody and placement at that time. Hence, he was entitled to his day in court. Finally, even if we assume waiver on the father's part, the paramount concern in placement and custody decisions is the best interests of the minor child. Although the court may consider one party's uncooperative behavior a salient factor, it must clearly articulate how the parent's recalcitrance bears on the child's best interests. Accordingly, we reverse the decision below and direct the trial court to hold a new hearing on custody and placement.

### Facts

¶ 2. Because the facts are so important to the legal issues in this case, we set them forth at some length. Timothy Gerard Guelig and Rebecca Lynn Guelig married on November 1, 1997. The parties had one child, Emma, born on February 15, 2001. On March 15, 2004, Rebecca filed a petition for divorce.

¶ 3. Two days later, on March 17, the family court commissioner entered an order requiring the parties to attend an educational program entitled "Living Apart, Parenting Together." The program's objective involved educating parents on the effects parental separation could have on their children. The order also directed the parties to file a proposed parenting plan by the time of the pretrial conference. A second order, dated April 21, ordered Timothy and Rebecca to attend a May 18 mediation session to discuss placement issues.

¶ 4. Both Timothy and Rebecca attended the mediation session and arrived at a stipulation with respect to temporary placement. The temporary placement agreement provided for essentially equal placement between the parties. The family court commissioner signed an order incorporating that stipulation the same day. The order called for the following arrangement: Mondays and Tuesdays were always with Rebecca, Wednesdays and Thursdays were always Timothy's days, and weekends, beginning on Friday and ending on Monday morning, would alternate each week. The parties were to meet on July 9 to further discuss the parenting plan.

¶ 5. Both Rebecca and Timothy also attended the program on parenting, pursuant to the March 17 order, on May 24. Among the subjects discussed at that program, the family court counselor went over the importance of parenting plans. She informed the parties that they needed to file their plans before any pretrial conference occurred and provided a booklet that explained the consequences of not doing so.

¶ 6. Rebecca appeared at a July 29 mediation as scheduled, but Timothy did not, and the mediation was rescheduled for August 10. The August 10 mediation did not result in any agreement on placement and

custody, so the court appointed a guardian ad litem on August 17. The court dismissed the GAL on November 5, however, because Timothy had not paid his share of the GAL fees. Timothy also failed to pay his $100 share of the placement mediation fees. Rebecca paid her $100 share.

¶ 7. Rebecca filed her parenting plan with the court on November 18. The plan contemplated joint legal custody but gave primary physical placement to Rebecca. Attached to the plan was a schedule for 2005. Each day highlighted in dark gray represented a day when Rebecca was to have placement. Other than which parent got placement, the schedule did not specify where the child would be (home, daycare, etc.) or at what times placement on a particular day would begin or end. Timothy did not receive a copy of Rebecca's plan.

¶ 8. The court commissioner reappointed the GAL in a December 3 order because Rebecca's counsel thought his services would help expedite the process of reaching an agreement. The order provided that each party must submit a proposed parenting plan to the clerk of courts by January 15, 2005. The parties were also to provide a copy to the GAL. In addition, the order directed the GAL to provide the parties, counsel, and the court with his written recommendation within ninety days. That recommendation was to include specific periods of placement for both parties "[i]n order to ensure that the best interests of the minor child(ren) are enhanced and promoted through a responsible assessment of placement."

¶ 9. The court held a scheduling conference on December 9. Both parties had notice of this hearing. Rebecca appeared with counsel, but Timothy did not attend. At the scheduling conference, the court asked

479

the GAL whether the parenting plan that Rebecca had submitted was "in any way emotionally harmful or in any way detrimental to the interest of the child." The GAL stated that it was not. The court subsequently entered a scheduling order. The order set a trial date of December 30. It also adopted Rebecca's parenting plan in its totality because she had "duly filed" her parenting plan and the court had not yet received one from Timothy.

¶ 10. Shortly thereafter, Timothy retained counsel. Counsel filed a motion on December 22 to adjourn the December 30 trial to a time when counsel was available and to reactivate the GAL. Counsel also moved to strike the parenting plan Rebecca had filed, asserting that it constituted an ex parte communication of which Timothy had received no notice. The motion further asked the court to vacate the part of the scheduling order that adopted Rebecca's parenting plan and maintained that Timothy was entitled to file his own plan and to have that plan considered by both the court and the GAL. Timothy filed his proposed parenting plan on December 27.

¶ 11. The court heard counsel's motion at the beginning of the December 30 proceedings. It called the family court counselor to testify about the educational programming that the parties attended and the process and procedure with respect to filing parenting plans. The counselor testified about what she goes over during that program and the materials she provides for participants. Timothy's counsel engaged the witness in the following colloquy:

> Q. Do you go through the difference between a scheduling conference and a pre-trial conference?
>
> A. No . . . .
>
> . . . .

Q. [T]here is only one place in the 48 page packet
[distributed at the program] where it says . . . that
you must file a parenting plan at or before any . . .
pre-trial conference . . . .

. . . .

Q. And it clearly says the pre-trial conference. There
is no reference in any of the material . . . that you
provide, or in any of the oral presentation that that
parenting plan has to be provided before a sched-
uling conference is held, correct?

A. Well, the statute calls it a pre-trial conference, so I
wouldn't call it anything else.

¶ 12. Following the counselor's testimony, the
court denied Timothy's request to continue the trial
and to reactivate the GAL. The court also made clear
that the issue of placement was off the table and
announced that no further custody study or mediation
would take place. In pertinent part, the court stated:

> [T]he Parenting Plan Agreement is very clear by stat-
> ute . . . . And if [the parties] want to proceed without an
> attorney, then it's their responsibility to know what the
> statute is . . . .
>
> And so the court wants to be very clear that [Wis.
> Stat. § 767.24(1m)] (2003–04)[1] reads as follows: In an
> action for . . . divorce . . . I cite the statute . . . in
> which . . . physical placement is contested, the party
> seeking . . . periods of physical placement, shall file a
> parenting plan with the Court before any pre-trial
> conference. I want to emphasize before any pre-trial
> conference. Doesn't say a pre-trial conference or the
> pre-trial conference. It says any pre-trial conference.
> It's this Court's interpretation that the Legislature was

---

[1] All references to the Wisconsin Statutes are to the
2003–04 version unless otherwise noted.

very clear not to in any way polarize, define or limit the application of that directive so that it would compromise the rights of anybody. The Court – the Trial Court sets trial dates at scheduling conferences or pre-trial conferences. It's not uncommon for many courts not to have pre-trial conferences, they use scheduling conferences. So once again, we talk in terms of any pre-trial conference. I'm satisfied that a scheduling conference falls within a definition of quote, any pre-trial conference. Then it further says, except with cause shown, a party required to file a parenting plan under this subsection who does not timely file a parenting plan, waives the right to object to the other party's parenting plan.

So the Court initially has to see whether or not there has been compliance here.

¶ 13. The court concluded that "[w]e have blatant non-compliance by [Timothy]." The court rejected the notion that Timothy's proposed plan was not untimely just because he had not first received a copy of his wife's parenting plan:

The statute – once again Mr. Young [defense counsel] would like to think that you should notice the world with this plan. I disagree. It's for the Court to then assess these plans. It isn't for somebody to then gear off of somebody else's plan and say well, okay, I think I'm going this direction or that direction. It permits each party to unilaterally, independently file a plan that they – that they feel is not only something that they feel very comfortable with, but also certainly would reflect in this Court's opinion a recognition that it would not be contrary to the best interest of the child.

The court held that Timothy did not cure that defect by subsequently filing his own plan. It pointed out that

only good cause excuses a violation of the statute and found that Timothy had shown none:

> And so now we're being asked . . . is there a sufficient cause shown that this Court should then set aside [Rebecca's] parenting plan – that scheduling order and permit this matter to go back into the custody evaluation arena. I disagree . . . . The statute talks in terms of shall. If the respondent didn't know that, he knows it now, and unfortunately that may work to his detriment. Should he be excused? No. He decided to go without an attorney. That's his choice. And if he doesn't know, then he should learn. This is his life, his soul, his property, and his family, and he can operate any way he elects to operate. But he does so at his peril.

¶ 14. The court asserted that despite the fact that it considered any objection to Rebecca's parenting plan waived, it had not merely rubber stamped that plan. It stated:

> I asked [the GAL] to explore [Rebecca's] plan, which he had done, and advise the Court whether or not he feels that that plan is in any way harmful – emotionally or physically harmful to the best interest of the child. The Court is not here to just rubber stamp a plan because it's a plan. I'm here to certainly recognize that I think the statute permits that. And the statute doesn't provide for qualifying of that. But I'm not of that fiber. I go one step deeper. And I want to make sure if there is a plan out there that the plan really is not contrary to the best interest of the child. [The GAL] indicated to the Court that the plan submitted by Mrs. Guelig did not fall within those concerns, and that he felt it was in the best interest of the child.

¶ 15. The trial proceeded on some other contested issues. At one point, Timothy's counsel attempted to cross-examine Rebecca with respect to her parenting

plan. Rebecca admitted that prior to the divorce proceeding, placement periods had been split equally and that she had not notified Timothy that she would be asking for primary physical placement. Counsel asked, "Do I gather from that then that before December 9, 2004, you didn't tell him you were going to ask for primary physical placement?" Rebecca's attorney objected, and the Court cut off this line of inquiry: "I'm going to sustain the objection . . . . [T]he fact of the matter is the Court has ruled on custody and placement . . . . The issue of custody and placement rests solely and exclusively on [Rebecca's] Parenting Plan."

¶ 16. The court sustained a similar objection when Timothy's counsel attempted to elicit Timothy's testimony regarding placement, directing counsel to "keep your questioning consistent with the issues before the Court, which is a dependency exemption, child support, and maintenance." It stated:

> I understand that [neither] Mr. Guelig nor yourself are real thrilled with the Court's ruling or how this matter is being addressed on the custody and placement . . . . I think we can all acknowledge that Mr. Guelig could sit there and until he's blue in the face and say I would love to have joint custody and shared placement. Okay. I don't think we need to have a diatram of testimony that provides for that . . . . Unfortunately, I don't find that testimony quite frankly to be appropriate at this time. So I'd ask that we avoid it.

Timothy's counsel responded by attempting to make an offer of proof. Timothy testified that he had not been told to file a parenting plan prior to the scheduling conference and attempted to explain why he had missed the proceedings that day. The court, interjecting, said, "Excuse [me], Mr. Young. What is the relevance of this? . . . He's pr[o] se, he's without an attorney, she has

an attorney. She's present, he's not. That's the bottom line." Counsel explained that he was attempting to show cause why the court should not simply adopt Rebecca's parenting plan, but the court would not allow him to proceed.

¶ 17. The trial court filed a judgment of divorce on January 26, 2005, which incorporated its oral rulings on the placement issue. It again held that Timothy had waived his right to object to Rebecca's parenting plan. It further pointed out that "[t]he GAL . . . advised the Court that said Parenting Plan was neither harmful to the child nor contrary to the child's best interests." Timothy filed his notice of appeal on February 4.

¶ 18. While his appeal was pending, Timothy moved the trial court on February 15 to clarify its judgment and to stay the judgment pending appeal. The hearing on that motion took place on February 23. The court declared that it would not reconsider its decision, reasoning that the parenting plan statute, WIS. STAT. § 767.24(1m), "did not give the Court, quite frankly, any discretion. And I think that's important to recognize. The statute's not couched in terms of may, could or should, it's couched in terms of shall. And so I think we have to certainly recognize that we have a legislative directive."

¶ 19. The trial court also reiterated to what extent it considered the GAL's recommendation and other factors in adopting Rebecca's parenting plan. It noted that the GAL had advised the court that the proposed plan was not "in any way emotionally harmful or in any way detrimental to the interest of the child." The court further asserted:

> I looked at [the plan] to see if this was completely disruptive, if it was completely contrary to what I would perceive to be fairness, and it wasn't. It wasn't.

> And in fact, the Parenting Plan itself I was very comfortable represented a very open recognition of the need to co-parent, while at the same time providing for specific days that each parent in fact could have the child.

The court elaborated that it had drawn on personal experience in adopting the plan:

> I have almost eight years ... as a Family [C]ourt Commissioner. I got seven grandkids and I've been in this business for 30 some years. I think I have a fair g[r]asp as to families, as to best interest, as to fairness, and I balanced all of that expertise and experience in assessing this situation myself, and in drawing from all of those past experiences and confirming in my own mind, coupled with the recommendation of the Guardian ad Litem or the statement by the Guardian ad Litem, that there is nothing detrimental, and I certainly acknowledge that. I didn't see that there was any issues here.

¶ 20. In addition to the foregoing issues, the motion hearing addressed the clarity of the imposed parenting plan. Attorney Young complained that "the Placement Plan, which was incorporated into the Judgment, does not provide anything really specific with respect to Mr. Guelig's periods of placement, and several problems have developed." Rebecca's counsel, Attorney McKibbage, disagreed. He represented that the plan provides that "[Timothy] should enjoy secondary placement Friday after daycare through Sunday evening and Sunday night." Further, he asserted that on "the off week" Rebecca intended that Timothy "have the child Wednesday and Thursday after daycare until the time certain, approximately 7:30 p.m." Accordingly, Attorney McKibbage asked the court to:

affirm the placement schedule of – on week one, Wednesday evening and Thursday evenings from after school until approximately 7:30 or 8:00 p.m. when Emma should be returned . . . . Further, affirming week two, which allows Mr. Guelig to pick her up after daycare and to keep her until Monday morning when he delivers her . . . to one or the other of the grandparents.

¶ 21. At one point while the parties were addressing the issue of ambiguities in the placement schedule, the following exchange ensued:

[THE COURT]: Mr. Young would like to think [the plan is] vague. It's not vague. There is nothing vague about this. It's very specific. It says the days.

. . . .

MR. GUELIG: ... I never had from 7:30 on Wednesday and Thursday nights. Never have I had that.

. . . .

MR. YOUNG: I'm looking at page 2 under physical placement, which I think is the germane part.

THE COURT: No, it's not . . . . You'd have to go beyond the . . . seven pages of the Parenting Plan, and on the last page, stapled to it, is the 2005 schedule.

MR. GUELIG: Where does it say Wednesday and Thursday at 7:30?

THE COURT: Mr. Guelig, I'm not here to pacify you . . . .

. . . .

MR. YOUNG: ... And I don't see any reference to 4:00 to 7:00 p.m. in the document that pertains to anything other than specific holidays . . . .

487

MR. McKIBBAGE: Your Honor, if I may, [i]f we're going to use that kind of logic. Now does it say overnight? Therefore you go to the author of the document, which in fact is Ms. Guelig. And I have stated her intent to this Court and the Court has adopted that.

MR. YOUNG: You can see our point perhaps, Your Honor, that maybe the placement schedule as adopted by the Court is vague and indefinite if we have to go back to the person that supposedly authored it to find out what it is, and there are specific limits that don't appear in there . . . .

. . . .

And . . . what's the schedule going to be in 2006? It's not here.

THE COURT: General theory will then just flow over to the next year.

MR. YOUNG: Doesn't say that. We're entitled to have a schedule that everybody can rely upon, particularly if the Court is going to adopt it without a trial.

The court ultimately declared that it was "satisfied that there is a sufficient specificity with regard to the placement structure that this Court adopted back on December 30" and that "the Parenting Plan speaks for itself. Mr. McKibbage has certainly articulated that." Further, it stated, "If there seems to be some question if there was a Wednesday overnight or not overnight, Mr. McKibbage has certainly addressed that." Accordingly, the court affirmed the parenting plan as "self-evident."

### Issues

¶ 22. We see several issues here and we address them each below. First, we address whether Rebecca was obligated to give Timothy a copy of her parenting plan before the court considered it. Second, we examine

488

whether Timothy's own parenting plan was timely submitted or whether he waived his right to object to Rebecca's plan. Upon concluding that no waiver occurred, we consider whether Timothy had an adequate opportunity to be heard before the court made its decision. Finally, we consider whether, even assuming waiver, the trial court was excused from making an independent inquiry into Emma's best interests and clearly articulating the basis for the decision it reached.

## I. Timothy should have received a copy of Rebecca's parenting plan

¶ 23. We begin by noting that Timothy never received a copy of Rebecca's parenting plan. The trial court made a specific finding to that effect, and the record contains a factual basis for this finding. *See* WIS. STAT. § 805.17(2) ("[f]indings of fact shall not be set aside unless clearly erroneous"). Our task is to determine the legal significance of this lack of notice, which requires us to examine the pertinent statutory and constitutional rules. Ascertaining the proper legal rules involves a question of law for our independent review. *See Steven V. v. Kelley H.*, 2003 WI App 110, ¶ 29, 263 Wis. 2d 241, 663 N.W.2d 817 (determining what legal rules to apply presents a legal question), *aff'd on other grounds*, 2004 WI 47, 271 Wis. 2d 1, 678 N.W.2d 856.

¶ 24. Determining the proper statutory rules to apply also requires us to engage in statutory interpretation. This endeavor also presents a question of law that we review de novo. *See Van Boxtel v. Van Boxtel*, 2001 WI 40, ¶ 11, 242 Wis. 2d 474, 625 N.W.2d 284. We attempt to identify and effectuate the legislature's intent when we interpret a statute. *Id.* Ordinarily, we

can discern this intent from the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We give the words in a statute their ordinary, common meanings. *Id.* Statutory context and structure also inform our interpretation of the statutory language, which we attempt to harmonize with surrounding and closely related provisions in order to avoid unreasonable results. *Id.*, ¶ 46. Where we can discern a plain meaning from these intrinsic sources, we go no further and apply the statute as written. *See id.*, ¶¶ 45–46. Where there is ambiguity, however, we may also consider extrinsic sources such as statutory history and purpose. *See id.*, ¶¶ 48, 50.

### A. Exchange of plans required by statute

¶ 25. WISCONSIN STAT. § 767.24(1m) describes the parenting plan at length. The relevant part reads:

> In an action for . . . divorce . . . in which legal custody or physical placement is contested, a party seeking sole or joint legal custody or periods of physical placement shall file a parenting plan with the court before any pretrial conference. Except for cause shown, a party required to file a parenting plan under this subsection who does not timely file a parenting plan waives the right to object to the other party's parenting plan.

The statute prescribes several factors the parent filing the plan must address. These factors include such considerations as where the child will attend school, what doctor or facility will provide the child's health care and medical care, what religious instruction, if any, the child will receive, the child's schedule during the holidays and in the summer, how parents will divide responsibility for making choices regarding the child's

490

education, health needs, child care providers, and extracurricular activities, and how the parent intends to resolve disputes with the other parent that touch on these matters. *See generally* § 767.24(1m)(a)-(o).

¶ 26. On the one hand, the trial court correctly observes that WIS. STAT. § 767.24(1m) only expressly requires parties to file their parenting plans with the court. The next sentence, however, greatly undermines the notion that only the court must receive a copy of a party's parenting plan. It clearly contemplates that where a parent timely submits a plan, he or she may object to the plan submitted by the other parent. We do not see how a party can object in good faith to a plan he or she never receives.

¶ 27. To blindly object, moreover, would most certainly constitute an unreasonable lack of cooperation with the other party, which the legislature clearly frowns upon. *See* WIS. STAT. § 767.24(2)(c) and (5)(am)10. Section 767.24(2)(c) directs the circuit court not to award sole legal custody to a parent who unreasonably refuses to cooperate with the other parent, and § 767.24(5)(am)10. requires the court, among the discretionary factors it considers in a custody and physical placement determination, to consider "[t]he cooperation and communication between the parties and whether either party unreasonably refuses to cooperate or communicate with the other party," *see* § 767.24(5)(am) (factors court must consider); *Goberville v. Goberville,* 2005 WI App 58, ¶¶ 6–8, 280 Wis. 2d 405, 694 N.W.2d 503 (how court weighs these factors in its decision is a matter of discretion). Moreover, we do not see how the parties can reasonably cooperate with each other, as the legislature contemplated in § 767.24(2)(c) and (5)(am)10. that they ought to do, if they share their parenting goals only with the court and not each other. At the very least, the

491

second sentence in subsection (1m), read together with (2)(c) and (5)(am)10., creates an ambiguity with respect to whether the legislature's "file . . . with the court" language means that only the court is entitled to a copy of a proposed parenting plan.

¶ 28. We turn to historical context and purpose for guidance. One commentator has remarked that the development of parenting plan legislation in this state mirrors the national trend. *See* Thomas J. Walsh, *In the Interest of a Child: A Comparative Look at the Treatment of Children Under Wisconsin and Minnesota Custody Statutes,* 85 MARQ. L. REV. 929, 958 (2002). According to this source, parenting-plan legislation has evolved over the past few decades at the urging of family law and mental health professionals. *Id.* at 957. These professionals deemed consistent contact with both parents to be beneficial to the child and sought to meet that goal by encouraging cooperation between parents following a marital breakup. *Id.* As a result, a major goal of parenting plan legislation nationwide has been shared parenting. *Id. See also* Heather Crosby, *The Irretrievable Breakdown of the Child: Minnesota's Move Toward Parenting Plans,* 21 HAMLINE J. PUB. L. & POL'Y 489, 509–10 (2000) (recognizing Washington among the first states to enact parenting plan legislation for purpose of encouraging parents to "come together to specify a plan").

¶ 29. This history reveals that parenting plans were designed to facilitate collaborative efforts between divorcing spouses with respect to postdivorce child rearing. This purpose is consistent with the references to cooperation in WIS. STAT. § 767.24(2)(c), *cf.* Walsh, *supra* at 959 (opines that forcing parents to think about various parenting issues prior to a pretrial conference is a benefit of Wisconsin's parenting plan legislation be-

cause it facilitates the possibility of settlement prior to the final hearing), and finds support in the legislative record. That record contains a memorandum from the Office of State Senator Gary R. George regarding an amendment to Senate Bill 107. This memorandum was the impetus for paragraph (2)(c) in that it proposed to add language that "the court may not give sole custody to a party who unreasonably refuses to cooperate with the other party." *See* Memorandum from Dan Rossmiller, Chief of Staff, Office of State Senator Gary R. George 1 (June 24, 1999) (on file with Legislative Reference Bureau). This same memorandum also identifies the proposed amendment as the source of language requiring parenting plans to be filed prior to a pretrial conference and explains that the intent behind that provision is that "initial determination by a trial court of contested custody issues should not proceed *or be scheduled for a final hearing* unless the disputing parents have done the work of preparing a parenting plan." *Id.* at 3 (emphasis added).

¶ 30. Based on Wis. Stat. § 767.24(1m), we conclude that Timothy was entitled to a copy of Rebecca's parenting plan, and the trial court should not have even considered custody and placement until both parties had the opportunity to review each other's plans. We therefore disagree with the trial court's assertion that parties should not "gear off of" each other's plans and change direction in response to each other's proposals. Indeed, borrowing from each other's ideas goes to the very heart of a collaborative process.

¶ 31. Wisconsin Stat. § 801.14, entitled, "Service and filing of pleadings and other papers," further bolsters our conclusion that parties are required to exchange their respective parenting plans before the court makes a determination on placement and custody.

493

Section 801.14(1) specifies what papers parties must exchange during litigation, reading in pertinent part, "Every . . . written notice, appearance, demand, offer of judgment, undertaking, and similar paper shall be served upon each of the parties." The foregoing discussion demonstrates that a parenting plan represents part of an undertaking between the parties to provide for postdivorce parenting. At the very least, it is something very similar.

## B. Exchange required by due process and fundamental fairness

¶ 32. When a judicial decree seeks to affect an individual's rights or interests, due process requires such notice and procedures as are adequate to safeguard those rights. *See Schiltz v. Roenitz*, 86 Wis. 31, 40, 56 N.W. 194 (1893); *Neylan v. Vorwald*, 124 Wis. 2d 85, 90, 368 N.W.2d 648 (1985). At the very least, due process mandates that a party has notice, actual or constructive, that is reasonably calculated to inform him or her of the pending decision as well as an opportunity to appear and be heard with respect to the defense of his or her rights. *See Schiltz*, 86 Wis. at 40; *MacLean v. First Nat'l Bank of Madison*, 47 Wis. 2d 396, 404, 177 N.W.2d 874. Our supreme court has remarked that due process also suggests a requirement that parties exchange copies of their briefs, motions, pleadings, and other documents. *See Wisconsin's Envtl. Decade, Inc. v. PSC*, 84 Wis. 2d 504, 528, 267 N.W.2d 609 (1978).

¶ 33. We come to the same conclusion with respect to the exchange of parenting plans. Placement and custody determinations indisputably affect paren-

tal rights to the care, companionship, and upbringing of one's children. Parents have a fundamental liberty interest in these rights, *Steven V.*, 271 Wis. 2d 1, ¶ 22, which our courts have counted among an individual's "most sacred natural rights," *Schiltz*, 86 Wis. at 40. Due process therefore comes into play. Parenting plans often play a major role in the court's placement determination. Indeed, WIS. STAT. § 767.24(5)(am)1. lists "[t]he wishes of the child's parent or parents, as shown by . . . any proposed parenting plan" among the factors a court is *obligated* to consider in making its decision. Given that a court must consider any proposed parenting plan, the other parent's right to object to that plan is essential for that parent to protect his or her own parental interests. As we suggested above, one cannot meaningfully object to a plan that he or she never sees.

## II. Timothy did not waive his right to object to Rebecca's parenting plan

### A. A scheduling conference is not a pretrial conference

¶ 34. WISCONSIN STAT. § 767.24(1m) requires parents to file a parenting plan with the court "before any pretrial conference." The trial court apparently interpreted "any pretrial conference" to mean "any conference that occurs prior to trial." While construing the statute, the court stated:

> I want to emphasize before *any* pre-trial conference. Doesn't say *a* pre-trial conference or *the* pre-trial conference. It says *any* pre-trial conference . . . . It's not uncommon for many courts not to have pre-trial conferences, they use scheduling conferences . . . . I'm satisfied that a scheduling conference falls within a defini-

tion of quote, any pre-trial conference. (Emphasis added.)

We disagree. "Pretrial conference" and "scheduling conference" are legal terms of art that refer to different types of proceedings.

¶ 35. We begin with the Wisconsin Statutes, which strongly suggest a difference between the two. WISCONSIN STAT. § 805.01(2) reads, in part, "Any party entitled to a trial by jury or by the court may demand a trial in the mode to which entitled at or before the scheduling conference or pretrial conference, *whichever is held first.*" (Emphasis added.) This section does not distinguish between the final pretrial conference and other pretrial conferences. It would make little sense to determine whether a scheduling conference occurred prior to a pretrial conference if a scheduling conference itself qualified as a pretrial conference.

¶ 36. We also rely on WIS. STAT. § 802.10(5), which sets forth the matters a court might consider at a pretrial conference. According to this section, the court at a pretrial conference may consider "any matter that facilitates the just, speedy and inexpensive disposition of the action." *Id.* As examples, the statute mentions such matters as formulation and simplification of issues, eliminating nonmeritorious claims or defenses, the possibility of stipulations or other agreements, admissibility rulings, addressing motions, and identifying witnesses, exhibits, and tangible demonstrative evidence. *See generally* § 802.10(5)(a)-(h). Although it also mentions a few scheduling matters, such as dates for trial, further conferences, and for filing and exchanging briefs, *see* § 802.10(5)(f) and (g), these matters are largely incidental to the main focus of a pretrial conference, preparing for "*disposition* of the action," § 802.10(5) (emphasis added).

496

¶ 37. Although the statute does not specifically mention scheduling conferences, we note that its predecessor did. *See* Wis. Stat. § 802.10(3)(a) (1993–94). That statute enumerated what matters the court could address at the scheduling conference, namely, setting a date for the pretrial conference and trial and setting times for hearing on a motion for default judgment, completion of discovery, and service and hearing of motions at or prior to the pretrial conference. All of these involve scheduling matters, as the term "scheduling conference" would suggest. They do not address the substantive issues in the action.

¶ 38. We conclude that the current statute did not intend to erase any distinction between scheduling conferences and pretrial conferences. Indeed, members of our supreme court just recently recognized a distinction between the two in *Phelps v. Physicians Insurance of Wisconsin, Inc.*, 2005 WI 85, ¶ 76, 282 Wis.2d 69, 698 N.W.2d 643 (Prosser, J., concurring in part, dissenting in part):

> [P]ractitioners must remain cognizant of the occasionally significant variation between one county's local rules and another's. For example, in Milwaukee, as we have seen in this case, the jury fee must be paid within 30 days after the *scheduling conference*. Milwaukee Cty. Ct. R. 371. By contrast, in Sheboygan County, the jury fee must be paid *at or before the scheduling conference*. Sheboygan Cty. Ct. R. 206. In Waukesha County, the fee must be paid at or before the *pre-trial conference*. Waukesha Cty. Ct. R. 6.1. In Marinette County, the jury fee is payable *at or before the scheduling or pre-trial conference, whichever comes first*. Marinette Cty. Ct. R. 207. (Emphases added.)

We do not see how the supreme court could have concluded that various court rules differed if a sched-

uling conference was merely one species of pretrial conference. Although a hearing convened for one purpose could sometimes evolve into another type of hearing, this happenstance does not affect what type of hearing the parties should be expected to anticipate.

### B. Timothy had no notice that the court might rule on placement or custody at a scheduling conference

¶ 39. As we noted earlier, due process requires, at a minimum, that a court refrain from deciding any issues affecting a party's rights until that party has had notice and an opportunity to be heard. Timothy did not get any notice that the court would consider the merits of the placement and custody issues at the scheduling conference. Although Wis. Stat. § 767.24(1m) warned Timothy that his failure to file a parenting plan before the pretrial conference would constitute a waiver, it said nothing about scheduling conferences, which, as we noted above, are meant to deal with scheduling issues. The family court counselor testified that she also told the parties to file their plans before a pretrial conference and never mentioned a scheduling conference, either orally or in the written materials she provided at the court-mandated educational program. These materials included the parenting plan form, which also stated that the parties were "required to file with the court a proposed parenting plan **before the pretrial conference.**"

¶ 40. In fact, Timothy had reason to believe the court would *not* consider placement and custody at the scheduling conference. First, the parenting plan form, handed to each party at the program on parenting,

contains language that would lead a reasonable person to believe that the parties would have an opportunity to see each other's respective plans before the court decided the issue. The first page of the form contains the following pertinent language:

> I am submitting this plan to the Court and *the other parent* now . . . .
>
> . . . .
>
> I understand that the purpose of this document is to provide reasonably specific information to the Court, *the other parent,* and other professionals involved in our case, about what my ideas are for raising our child(ren) and how I intend to make this plan work . . . .
>
> . . . .
>
> I request the right to follow up and add to my answers after the other parent and I have *seen each other's plans.* I understand it is the Court's desire that we will be able to *agree to a plan once we understand what the other is seeking.* (Emphases added.)

Moreover, the court's December 3, 2004 order expressly ordered the parties to file a parenting plan "on or before *January 15, 2005.*" (Emphasis added.) It also ordered the GAL to submit a report containing his own recommendation on custody and placement "**within 90 days** whereupon a hearing may be scheduled, if necessary." Despite the fact that the scheduling conference was to take place six days after this order was filed, the order set deadlines for the filing of parenting plans and the GAL's recommendation for *weeks* later. The notion that the court might address placement and custody on December 9 instead of following the timetables expressed in its December 3 order, without notifying the parties of its change in plans, defies all common sense.

499

Thus, Timothy's failure to appear on December 9 did not waive his rights to have his parenting plan considered and to object to his wife's proposal.

## C. Timothy timely submitted his parenting plan

¶ 41. Timothy's submission of his parenting plan complied both with statutory mandates and with the December 3 court order. A parent does not waive the right to oppose his or her spouse's parenting plan unless that parent fails to submit a parenting plan by the pretrial conference. Here there was only a December 9 scheduling conference and a December 30 trial. There was no pretrial conference. Thus, Timothy could not have violated the statute. Moreover, Timothy filed his parenting plan on December 27, well before the January 15 date specified by court order.

## III. Timothy did not receive his day in court, even though he did not waive his right to be heard

¶ 42. Rebecca's counsel appears to suggest that this lack of notice did not actually prejudice Timothy because in spite of his failure to appear at the scheduling conference, "the Court entertained extensive testimony by [Timothy] concerning not only his placement preferences but in fact his objection to [Rebecca's] Parenting Plan." Counsel represents that "the Trial Transcript is replete with page after page of testimony by [Timothy] clearly stating his position as to the 'best interests' of the minor child." He contends that Timothy got "his 'day in court' both physically and substantively"

when the trial court considered his testimony and applied the law and its discretion to reach a decision.

¶ 43. We strongly disagree with this characterization, as it is obvious that Timothy did not get his day in court. Although Timothy did attempt to raise the issue several times, the trial court cut him off each time. First, it decided before it heard any testimony whatsoever that it was going to affirm Rebecca's parenting plan. When Attorney Young attempted to bring up placement and custody during cross-examination of Rebecca, the Court sustained Attorney McKibbage's objection, stating, "[T]he Court has ruled on custody and placement . . . . The issue of custody and placement rests solely and exclusively on [Rebecca's] Parenting Plan." The court also curtailed direct examination of Timothy, instructing Attorney Young to confine his questioning to the tax exemption for Emma, child support, and maintenance because it did not want to hear "a diatram of testimony" from Timothy and furthermore did not "find that testimony quite frankly to be appropriate at this time." Finally, it cut off Timothy's offer of proof. Contrary to Attorney McKibbage's representations, Timothy most certainly did not have a meaningful opportunity to be heard. This omission violated Timothy's right to due process.

## IV. Even assuming waiver, the court failed in its duty to consider Emma's best interests

■

¶ 44. A circuit court has wide discretion in making a decision with respect to a child's physical placement. *Goberville*, 280 Wis. 2d 405, ¶ 6. We will not upset the court's decision unless it erroneously exercised its discretion. *Id.*, ¶ 7. The court properly exer-

cises its discretion whenever it examines the relevant facts, applies a proper standard of law, and, using a demonstrated rational process, arrives at a conclusion that reasonable judges could reach. *Id.*

¶ 45. WISCONSIN STAT. § 767.24(5)(am) lists specific factors the court must examine when it makes a custody determination, including the following:

> 1. The wishes of the child's parent or parents, as shown by any stipulation between the parties, any proposed parenting plan or any legal custody or physical placement proposal . . . .
>
> . . . .
>
> 10. The cooperation and communication between the parties and whether either party unreasonably refuses to cooperate or communicate with the other party.

We focus on these two factors because they are the only two statutory factors that the record reveals the court arguably addressed.

¶ 46. The trial court certainly referred to Rebecca's parenting plan. The court stated that at the scheduling hearing, it had asked the GAL to comment on the plan, specifically whether it was "in any way emotionally harmful or in any way detrimental to the interest of the child," and that the GAL answered in the negative. The court further observed that it did not see anything in the parenting plan to indicate that it was "completely disruptive," "completely contrary to what [the court] would perceive to be fairness," and that it recognized the need to coparent.

¶ 47. Although the court considered Rebecca's parenting plan, the record does not show that it did so in light of the proper legal standard, the best interests of the child. It is not enough that one parent's plan is not "emotionally harmful or in any way detrimental,"

does not run contrary to fairness, or that the plan recognizes the need to coparent. One would hope that any parenting plan would meet those basic criteria. The standard is whether that plan is *best for Emma.* The record does not reveal why Rebecca's plan was best for Emma, better for Emma than some other arrangement, or even affirmatively *good* for Emma. Thus, the record does not support the conclusion that the court's decision is justified by WIS. STAT. § 767.24(5)(am)1.

¶ 48. We next turn to the major factor the court emphasized in its adoption of Rebecca's parenting plan: Timothy's uncooperative behavior. The court observed that Timothy had failed to attend a mediation session, alluded to his failure to pay guardian ad litem or mediation fees, and noted his voluntary absence from the scheduling conference. The court evidently considered Timothy's failure to submit his parenting plan prior to the scheduling conference to be part of a larger pattern of insolence that did not deserve to be rewarded. Here too, the record does not reveal that the trial court applied the proper legal standard. We appreciate the trial court's frustration with Timothy's recalcitrance. However, WIS. STAT. § 767.24(5)(am) clearly directs the court to consider not what placement schedule Timothy *deserves* but rather what arrangements are best for Emma. Again, the record is simply insufficient to reveal that the court considered Timothy's uncooperative behavior in light of its impact on Emma's well-being. Because the record is so lacking, we cannot be confident that § 767.24(5)(am)10. supports the court's exercise of discretion.

¶ 49. We do not deem WIS. STAT. § 767.24(1m) to relieve the court of the obligation to articulate how its decision bears on Emma's best interests. Again, we must attempt to harmonize closely related statutory

provisions. We note that § 767.24(5)(am) states the court's obligation to consider the child's best interests in absolute terms. We will not read in an exception. It is perfectly consistent to say on the one hand that a parent who fails to comply with legislative directives has no right to object to his or her spouse's proposal while still requiring the court to engage in a searching analysis and thorough discussion of what placement arrangement benefits the child. We simply do not find an adequate discussion in the record.

¶ 50. The trial court pointed out that it had relied on several factors relevant to its experience in the realm of family matters in addition to the GAL's recommendation. It cited, for example, its experience as a family court commissioner, its thirty years in the family law business, and its experience with its own family. We are confident that the trial court has a wealth of experience, both professional and personal, on which to draw. Trial judges do not make their decisions in a vacuum. Rather, we appreciate that a judge's personal background can be a valuable asset in reaching wise and informed decisions. The problem we have in this case is that the record does not demonstrate how those factors shaped the court's decision that Rebecca's parenting plan serves Emma's best interests.

¶ 51. What we can discern from the record is that the court originally purported to adopt the plan in its entirety, no more, no less. The four corners of the incorporated plan and the attached schedule specified only the following details: the placement schedule on holidays and, for the year 2005, what days were assigned to each parent. It did not say when or where the parties were to meet to switch placement. It did not, moreover, specify whether Emma would be at the home of the parent with placement, at daycare, or somewhere

else on any particular day. Moreover, the plan did not specify a day-to-day schedule beyond 2005. Yet, at the reconsideration hearing, numerous additional details surfaced. The transcript reveals that the court accepted the plan as "Mr. McKibbage ... articulated" and that Attorney McKibbage admitted that his articulation of these details was based on his understanding of Rebecca's *intent.* Because the record reveals no objective, independent basis for these supplementations, we cannot assume that the court incorporated them when it adopted Rebecca's plan. Accordingly, we hold that the record does not reveal a proper exercise of discretion.

¶ 52. We reverse and remand to the trial court with directions to hold a hearing on the placement and custody issues at which it shall consider both parties' proposed parenting plans and all relevant statutory factors. Its decision must clearly articulate, moreover, how those factors translate into the particular arrangement the court ultimately adopts. We hold that Timothy did not waive his right to be heard with respect to placement and custody. He was entitled to a copy of Rebecca's parenting plan. He never received it. Moreover, he filed his own plan in a timely manner. There was no pretrial conference, he submitted the plan by the deadline prescribed in the court's December 3 order, and he had no notice whatsoever that the court might consider the placement and custody issues at an earlier time. Finally, even if Timothy had waived his right to contest Rebecca's parenting plan, the record does not articulate the basis for the court's decision or how it relates to the various statutory factors.

*By the Court.*—Judgment reversed and cause remanded with directions.