SEIDL, J.
*582 *270 ¶1 Timothy Miller appeals an order granting Angela Carroll's motion for modification of custody and physical placement of their minor son, Bruce,[1] and establishing child support payments by Miller. He also appeals an order denying his motion for reconsideration. Miller argues the circuit court demonstrated objective bias by accepting a Facebook "friend" request from Carroll after a contested evidentiary hearing, but before issuing a decision on Carroll's motion.[2]
¶2 This case involves what appears to be an issue of first impression in Wisconsin: a claim of judicial bias arising from a judge's use of electronic social media (ESM). Although we need not determine whether a bright-line rule prohibiting the judicial use of ESM is appropriate or necessary, we conclude that the circuit court's undisclosed ESM connection with a current litigant in this case created a great risk of actual bias, resulting in the appearance of partiality. Accordingly, Miller has demonstrated the judge was objectively biased. We therefore reverse and remand the case for further proceedings before a different judge.
BACKGROUND
¶3 In 2011, pursuant to the parties' stipulation, the circuit court entered an order granting Miller and *271 Carroll joint legal custody and shared physical placement of Bruce. Five years later, in August 2016, Carroll filed a motion to modify the order, seeking sole legal custody and primary physical placement of Bruce, and an order for child support payments from Miller.
¶4 On June 7 and 8, 2017, an evidentiary hearing on Carroll's motion was held before Judge Michael Bitney. As relevant to this appeal, Carroll introduced evidence at the hearing that Miller had engaged in a pattern of domestic abuse against her. Miller denied Carroll's allegations. At the conclusion of the hearing, Judge Bitney took the matter under advisement and gave the parties ten days to submit written arguments.
¶5 The parties submitted their final written arguments on June 16, 2017. Three days later, Judge Bitney accepted a Facebook "friend" request from Carroll. This Facebook connection was not disclosed to Miller or his counsel.
¶6 From the time the Facebook connection was established until Judge Bitney issued his written decision on Carroll's motion, Carroll "liked" eighteen of Judge Bitney's Facebook posts and commented on two of his posts.[3] None of these "likes" or comments were directly related to the pending litigation. Judge Bitney did not "like" or comment on any of Carroll's *583 posts, nor did he reply to any of her comments on his posts. *272 However, at a later hearing, Judge Bitney did not deny reading any posts made by Carroll.
¶7 During this same timeframe-i.e., from the establishment of the Facebook connection until issuance of the decision on Carroll's motion-Carroll also "liked" multiple third-party posts and "shared" one third-party photograph related to domestic violence.[4] Although there is no evidence Judge Bitney ever directly observed the third-party posts, it is undisputed that, due to the nature of a Facebook "friendship," Carroll's activity could have appeared on his Facebook "newsfeed."
¶8 On July 14, 2017, the circuit court issued a written decision. In relevant part, the court found Carroll had shown "by the greater weight of credible evidence that Mr. Miller has engaged in a pattern of domestic abuse against ... Carroll." The court then found this pattern of domestic abuse constituted a substantial change in the parties' circumstances since entry of the 2011 custody and physical placement order. Consequently, the court granted Carroll sole legal custody and primary physical placement of Bruce. The court also ordered the parties to submit updated financial disclosure statements in order to determine Miller's child support obligations "in light of the changes regarding physical placement."[5] Further, *273 the court granted Carroll permission to move with Bruce from Rice Lake to Durand.
¶9 That same day, the guardian ad litem (GAL) for Bruce "was made aware of a Facebook post authored by Ms. Carroll regarding the court order." The GAL searched for and located this post, which read in relevant part that "[t]he Honorable Judge has granted everything we requested." During her search, the GAL also "inadvertently discovered" that Carroll and Judge Bitney were Facebook "friends." The GAL reported the Facebook connection to Miller's counsel, who in turn informed Miller.
¶10 Miller confirmed the Facebook connection between Carroll and Judge Bitney. He then moved the circuit court for reconsideration of its decision under WIS. STAT. § 805.17(3) (2017-18),[6] and for relief from the order under WIS. STAT. § 806.07. Miller argued, in relevant part, that Judge Bitney's Facebook connection with Carroll during the pendency of the proceedings gave rise to the appearance of partiality. Thus, Miller requested judicial disqualification and a new hearing.
¶11 At a hearing on Miller's motion, Judge Bitney confirmed that he had accepted Carroll's friend request after the custody hearing and before rendering his written decision. However, he concluded he was not subjectively biased by accepting Carroll's "friend" request, because he already "had decided how I was going to rule, even though it hadn't been reduced to writing." Further, he concluded that "[e]ven given the timing of" his and Carroll's Facebook connection, the *274 circumstances did not "rise[ ] to the level of objective bias...." Consequently, he denied Miller's motion. Miller now appeals. *584 DISCUSSION
¶12 The right to an impartial judge is fundamental to the notion of due process under both the United States and Wisconsin Constitutions. See State v. Goodson , 2009 WI App 107, ¶8, 320 Wis.2d 166, 771 N.W.2d 385. We presume that a judge has acted fairly, impartially, and without bias; however, this presumption is rebuttable. Id. To determine if the presumption in favor of a judge's impartiality has been rebutted, we generally apply two tests: one subjective and one objective. Id. Here, Miller does not contend the circuit court was subjectively biased. Therefore, we examine only whether the court demonstrated objective bias.
¶13 Objective bias can exist in two situations: (1) where there is the appearance of bias or partiality; or (2) where objective facts demonstrate that a judge treated a party unfairly. Id. , ¶9. In this case, Miller argues that objective bias exists due to the appearance of partiality.
¶14 The appearance of partiality constitutes objective bias when a reasonable person could conclude "that the average judge could not be trusted to 'hold the balance nice, clear, and true' under all the circumstances." State v. Gudgeon , 2006 WI App 143, ¶24, 295 Wis.2d 189, 720 N.W.2d 114 (quoting In re Murchison , 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ). In other words, *275 when the facts of a case reveal a great risk of actual bias, the presumption of impartiality is rebutted and a due process violation has been established. State v. Herrmann , 2015 WI 84, ¶3, 364 Wis.2d 336, 867 N.W.2d 772. A circuit court judge's partiality is a matter of law that we review de novo. Goodson , 320 Wis.2d 166, ¶7, 771 N.W.2d 385.
¶15 The parties point to no Wisconsin case addressing the issue of judicial use of ESM in the context of a judicial bias claim. Nor has our own research of the case law revealed any controlling authority. We also note that no Wisconsin advisory ethics opinion directly addresses this issue. However, several persuasive authorities-namely, out-of-state legal decisions and an American Bar Association (ABA) advisory ethics opinion-provide some guidance.
¶16 These authorities conclude that judicial use of ESM, standing alone, generally does not require judicial disqualification. See, e.g. , State v. Thomas , 376 P.3d 184, 198 (N.M. 2016) ; see also Law Offices of Herssein & Herssein, P.A. v. United Servs. Auto. Ass'n , --- So. 3d ----, ----, 2018 WL 5994243 at *7 (Fla. Nov. 15, 2018). Still, the authorities caution that judges must be careful to avoid creating the appearance of impropriety through their use of ESM. See Thomas , 376 P.3d at 198. Put simply, they reflect the common-sense rationale that "[a] judge may participate in electronic social networking, but as with all social relationships and contacts, a judge must ... avoid any conduct that would undermine the judge's independence, integrity, or impartiality, or create an appearance of impropriety." ABA Formal Op. 462 at 1 (2013) (italics omitted).
¶17 We find the reasoning of the New Mexico supreme court in Thomas particularly instructive. In *276 that case, a defendant argued that a judge's social media postings during the pendency of his trial demonstrated judicial bias. Thomas , 376 P.3d at 194. Although the court reversed the case on other grounds, it discussed the concerns raised by judicial use of ESM and concluded:
While we make no bright-line ban prohibiting judicial use of social media, we caution that "friending," online postings, and other activity can easily be misconstrued and create an appearance of impropriety. Online comments are public *585 comments, and a connection via an online social network is a visible relationship, regardless of the strength of the personal connection.
....
A judge's online "friendships," just like a judge's real-life friendships, must be treated with a great deal of care. The use of electronic social media also may present some unfamiliar concerns, such as the inability to retrieve or truly delete any message once posted, the public perception that "friendships" exist between people who are not actually acquainted, and the ease with which communications may be reproduced and widely disseminated to those other than their intended recipients.
Id. at 198-99.
¶18 Like the Thomas court, we also need not determine whether a bright-line rule prohibiting judicial use of ESM is necessary or appropriate. The appropriateness of a bright-line ban need not be determined because, based on the facts of this case, we conclude that Judge Bitney's actions created an appearance of partiality. We explain our reasoning below, *277 but first provide a brief overview of a Facebook "friendship" and other connections that the Facebook platform affords.
¶19 Facebook is an ESM networking service that allows users to create online profiles to share information about themselves with other Facebook users. Herssein , --- So.3d at ----. Once created, a Facebook profile may be customized by a user to include personal information, photographs, videos, links to internet pages, and other various content. Id. After creating a profile, a user may attempt to establish connections with other Facebook users by sending them a "friend" request. Id. If the "friended" user accepts the request, then the two users become Facebook "friends." Id. In other words, a Facebook "friendship" is officially established when one user accepts a previously sent "friend" request from another user. Id. Subject to certain adjustable privacy settings-none of which the parties claim were in use here-"friends" have the ability to view and interact with each other's profiles.[7] See Lane v. Facebook, Inc. , 696 F.3d 811, 816 (9th Cir. 2012) ; see also State v. Eleck , 130 Conn. App. 632, 634 n.1, 23 A.3d 818 (2011). Further, when a user visits his or her Facebook page, he or she is automatically presented with, among other things, activity from some of his or her Facebook "friends" on their Facebook "newsfeed." See In re CTLI, LLC , 528 B.R. 359, 365 (Bankr. S.D. Tex. 2015).
¶20 Here, Judge Bitney confirmed that he and Carroll became Facebook "friends" after he accepted her "friend" request. Miller argues that this connection *278 created an appearance of partiality because "most people ... would be shocked and distrustful" of Judge Bitney's actions in accepting the request. Carroll, on the other hand, argues "it is entirely unsupported ... to take the position that any reasonable person would or could question the impartiality of Judge Bitney[.]"[8] For the following reasons, we agree with Miller that Judge Bitney's actions created a great risk of actual bias, resulting in the appearance of partiality. *586 ¶21 First, the time when Judge Bitney and Carroll became Facebook "friends" would cause a reasonable person to question the judge's partiality. Although Judge Bitney apparently had thousands of Facebook "friends," Carroll was not simply one of the many people who "friended" him prior to this litigation. Rather, Carroll was a current litigant who reached out to Judge Bitney and requested to become his Facebook "friend" after testifying at a contested hearing, at which Judge Bitney was the sole decision-maker. Judge Bitney then took the affirmative step to accept this "friend" request before issuing his decision in this case.
¶22 This timing creates a great risk of actual bias and a resulting appearance of partiality because, even assuming that a Facebook "friendship" does not denote the type of relationship traditionally associated with the term "friendship," it is unquestionably evidence of some type of affirmative social connection. As explained above, two Facebook users may only become "friends" when one user accepts another user's "friend"
*279 request. Carroll's choice to send a "friend" request to Judge Bitney, combined with Judge Bitney's choice to accept that request before issuing his decision, conveys the impression that Carroll was in a special position to influence Judge Bitney's ultimate decision-a position not available to individuals that he had not "friended," such as Miller.
¶23 Second, the great risk of actual bias and resulting appearance of partiality created by the Facebook connection between Carroll and Judge Bitney is heightened because the connection was not disclosed to any of the other parties or attorneys involved in the case. As Miller notes, this lack of disclosure leads to reasonable concerns regarding Carroll and Judge Bitney's Facebook connection. Namely, a reasonable person could believe Carroll sent the "friend" request in an attempt to influence Judge Bitney's decision. And, because the other party had no opportunity to respond to this attempt or to review how Carroll and Judge Bitney interacted through their Facebook friendship, a reasonable person could believe that Carroll did exert, either directly or indirectly, some influence. While the actual motivations of Carroll may have been innocuous, and Judge Bitney's decision-making may not have been affected, those possibilities do not alter our conclusion that a reasonable person would question the judge's ability to "hold the balance nice, clear, and true" in light of the undisclosed ESM connection during the pendency of this case. See Gudgeon , 295 Wis.2d 189, ¶24, 720 N.W.2d 114.
¶24 Third, and relatedly, Carroll's sending a "friend" request to Judge Bitney during ongoing litigation raises ex parte communication concerns. An ex parte communication is a one-sided communication *280 between a litigant or their representative and the judge presiding over a case involving the litigant. See State v. Tyler T. , 2012 WI 52, ¶2 n.3, 341 Wis.2d 1, 814 N.W.2d 192. The Facebook connection between Carroll and Judge Bitney involved ex parte communications. Miller was unaware that Carroll communicated to Judge Bitney that she desired to be his Facebook "friend" while their case was pending, and that Judge Bitney communicated back to her that he accepted her request prior to issuing his decision in the case. Further, as explained below, ex parte communication occurred to the extent Judge Bitney and Carroll viewed each other's Facebook posts.
¶25 Ex parte communications are generally prohibited because they may be initiated-or at least appear to be initiated-in an attempt to influence a judge's decision. See *587 Jocius v. Jocius , 218 Wis.2d 103, 109, 580 N.W.2d 708 (Ct. App. 1998). As the Florida Supreme Court aptly stated:
Nothing is more dangerous and destructive of the impartiality of the judiciary than a one-sided communication between a judge and a single litigant. Even the most vigilant and conscientious of judges may be subtly influenced by such contacts. No matter how pure the intent of the party who engages in such contacts, without the benefit of a reply, a judge is placed in the position of possibly receiving inaccurate information or being unduly swayed by unrebutted remarks about the other side's case.
Rose v. State , 601 So.2d 1181, 1183 (Fla. 1992). In other words, ex parte communications have the potential to erode public confidence and create the appearance of partiality.
*281 ¶26 That erosion of public confidence and appearance of impropriety occurred here. In addition to the concerns discussed above, Judge Bitney's acceptance of Carroll's "friend" request placed him in a position to view Carroll's Facebook activity on his newsfeed.[9] It is undisputed that this activity included "liking" and "sharing" of posts related to domestic violence. We conclude that, because domestic violence was an issue in the pending case, a reasonable person would perceive Judge Bitney's access to these posts as potentially influencing his decision. Regardless of whether Judge Bitney either viewed these posts or was actually influenced-i.e., whether he was subjectively biased-this perception further establishes the existence of objective bias.
¶27 Fourth, although a violation of an ethical rule does not, standing alone, show that a judge's conduct offends due process, we may consider Wisconsin Supreme Court Rules (SCR) when considering a claim of objective bias. See State v. Pinno , 2014 WI 74, ¶94, 356 Wis.2d 106, 850 N.W.2d 207. Here, Judge Bitney's actions arguably implicate multiple rules that stress the importance of an independent and impartial judiciary. See, e.g. , SCR 60.02 ("An independent and honorable judiciary is indispensable to justice in our society"); SCR 60.03(1) ("A judge ... shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."); SCR 60.04(1)(g) ("A judge may not initiate, permit, engage in or consider ex parte communications concerning a *282 pending or impending action or proceeding...."). Again, these ethical rules do not directly address judicial use of ESM. But as the comment to SCR 60.03(1) notes:
The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in [SCR chapter 60].
We have already explained how Judge Bitney's actions in this particular case created a great risk of actual bias and a resulting appearance of partiality; we cannot ignore this appearance merely because there is no direct prohibition in our ethical rules against judicial use of ESM. Instead, because these rules reinforce the obligation of the judiciary to both remain-and appear to remain-impartial, they reinforce *588 our conclusion that Judge Bitney's actions were impermissible.
¶28 Finally, we address a cursory argument Carroll makes that because Miller "offered no evidence from a neutral and reasonable individual[,]" he cannot satisfy the objective test for judicial bias. We understand Carroll to be arguing that Miller was required to present a third-party witness to testify that Judge Bitney could not be trusted to hold the balance nice, clear and true under the circumstances present in this case. However, Carroll points to no legal authority supporting this position. In addition, her argument ignores our standard of review, as we independently determine whether the reasonable person standard has been met as a matter of law. See Goodson , 320 Wis.2d 166, ¶¶7, 10, 771 N.W.2d 385. We will not consider this undeveloped *283 argument further. See State v. Pettit , 171 Wis.2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).
CONCLUSION
¶29 We conclude that, under the facts of this case, the establishment of an undisclosed Facebook connection between Judge Bitney and Carroll during ongoing litigation created a great risk of actual bias resulting in the appearance of partiality. Therefore, the presumption of Judge Bitney's impartiality has been rebutted and a due process violation occurred. See Herrmann , 364 Wis.2d 336, ¶67, 867 N.W.2d 772. Although we do not determine the general propriety of judicial use of ESM, we caution that judges should recognize that online interactions, like real-world interactions, must be treated with a degree of care. See Thomas , 376 P.3d at 199 ; see also State v. Blalock , 150 Wis.2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground."). The facts of this case indicate that Judge Bitney did not exercise that degree of care in accepting Carroll's Facebook "friend" request.
¶30 Our decision does not reach the merits of Judge Bitney's ultimate decision on Carroll's motion, and we recognize the parties will be required to relitigate their custody and physical placement issues. However, we cannot ignore the constitutional requirement that Miller have the custody and physical placement determinations regarding Bruce made by an impartial decision-maker.[10] Our adherence to this fundamental *284 precept of due process compels us to reverse the decision and remand with directions that the case proceed before a different judge.
By the Court. -Orders reversed and cause remanded with directions.

The name Bruce is a pseudonym that we will use in this opinion to refer to the parties' minor son.

Miller also argues the circuit court erroneously exercised its discretion in granting Carroll's motion. However, because we conclude that Miller has demonstrated the judge was objectively biased, we do not reach the merits of the court's decision.

Facebook users can click a "like" button, which is represented by a thumbs-up icon, to "like" a Facebook page or post. See Bland v. Roberts , 730 F.3d 368, 385 (4th Cir. 2013). Other Facebook users can view who has "liked" a page or post, thus "[o]n the most basic level, clicking on the 'like' button literally causes to be published the statement that the User 'likes' something." Id. at 385-86. See infra ¶19.

"Sharing" a Facebook page or post is a way for Facebook users to "generally publish information ... to their personal profile, and the information is thereby broadcasted to the members' online 'friends' (i.e., other members in their online network)." Lane v. Facebook, Inc. , 696 F.3d 811, 816 (9th Cir. 2012). See infra ¶19.

The parties ultimately stipulated that Miller would make monthly child support payments of $552.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

This interaction may include "liking" or "sharing" a post, as described above. See supra ¶¶6-7 nn.3-4.

We note that Carroll's argument in support of this position focuses on Judge Bitney's lack of subjective bias. However, as stated above, Judge Bitney concluded that he was not subjectively biased, and Miller does not challenge this conclusion on appeal.

Given the nature of a Facebook friendship, a Facebook user knows, or reasonably should know, that such viewing is possible and that it may occur without a user doing anything more than visiting one's own Facebook page.

Physical placement and legal custody determinations indisputably implicate parental rights, which are a fundamental liberty interest. See Guelig v. Guelig , 2005 WI App 212, ¶33, 287 Wis.2d 472, 704 N.W.2d 916