COURT OF APPEALS
DECISION
DATED AND FILED

July 2, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1227-CR**

Cir. Ct. No. **2012CF309**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT III**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

CHRISTOPHER DEAN BUNTEN,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Douglas County: KELLY J. THIMM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Christopher Bunten appeals a judgment convicting him of second-degree sexual assault of an intoxicated person incapable of giving

consent. He also appeals an order denying his motion for postconviction relief. Bunten argues his trial attorney was ineffective in various ways. He also argues the circuit court erred by denying his motion for a new trial based upon newly discovered evidence. In the alternative, he asks this court to grant him a new trial in the interest of justice. Finally, he argues the circuit court exhibited judicial bias during the postconviction hearing, and we should therefore reverse the order denying postconviction relief and remand for a new postconviction hearing before a different judge. We reject each of Bunten's arguments and affirm.

## BACKGROUND

¶2    On the evening of January 2, 2012, the Superior Police Department received a call reporting that a woman had been raped. When officer Eric Olson responded to the call, three individuals were present at the scene—the victim, Candace;[1] her friend, Monica Edquist; and Monica's husband, Richard Edquist. Candace told Olson that Bunten, who was her niece Laura's boyfriend, had raped her earlier that evening. Olson took Candace to the hospital, where she was examined by a sexual assault nurse examiner (SANE).

¶3    The State ultimately charged Bunten with three counts: (1) burglary; (2) second-degree sexual assault by use of force; and (3) second-degree sexual assault of an intoxicated person incapable of giving consent. Bunten pled not guilty, and the case proceeded to trial.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2017-18), we refer to the victim and her niece using pseudonyms. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶4 At trial, Candace testified that on the morning of January 2, 2012, she was at her apartment with Monica and Richard Edquist, who had stayed there the night before. Candace began drinking beer at about 7:00 a.m. and consumed approximately thirty beers throughout the day. She and the Edquists also smoked marijuana. At some point in the day, Bunten arrived at Candace's apartment. He offered Candace and the Edquists methamphetamine, which all four of them then smoked. Candace continued drinking and smoking marijuana after smoking the methamphetamine that Bunten provided.

¶5 Candace testified that "a couple hours" after Bunten arrived at her apartment, she told her guests that she "was going to go pass out," and she instructed Monica "[t]o make sure that everybody is gone and make sure my door is locked." Candace testified that she then went to bed and passed out. Monica testified that she, Richard, and Bunten left the apartment shortly thereafter. Monica "remember[ed] locking the door," but she then "walked back to the room to tell [Candace] something," and she saw Bunten "with his hand behind the door like he was trying to unlock it." Bunten and the Edquists then began to leave, but as they were walking down the exterior hallway of Candace's apartment building, Bunten said he had forgotten something and turned to go back to Candace's apartment. Monica testified she and her husband waited for Bunten in the parking lot for about ten minutes and then left.

¶6 Candace testified she had no recollection of Bunten and the Edquists leaving her apartment. After going into her bedroom to pass out, the next thing she remembered was waking up to find Bunten having sex with her. She testified that she struggled against Bunten and told him to get off of her, but Bunten continued having penis-to-vagina intercourse with her until she bit him. At that point, Bunten stopped the assault and left her apartment.

¶7    After Bunten left, Candace called Laura and one of her other nieces and told them Bunten had raped her, but "they didn't want to believe" it. Candace then called her sister, who testified Candace sounded intoxicated during their conversation. After speaking with her sister, Candace called Monica. Monica and Richard returned to Candace's apartment, and Monica called the police.

¶8    Officer Olson testified that when he arrived at Candace's apartment, Candace was "very drunk." He took Candace to a hospital, where she was examined by Cizzarie Leann Johnson Schomberg, a certified SANE. During the examination, Schomberg collected blood and urine samples from Candace and took swabs of her genital areas. She noted that Candace had a fresh injury to her perianal area. Schomberg testified Candace appeared to be intoxicated during the examination.

¶9    Amanda Hanson, a toxicologist from the Wisconsin State Crime Laboratory, testified that she participated in analyzing the urine sample taken from Candace during the SANE examination. According to Hanson, Candace's urine tested positive for alcohol, amphetamines, methamphetamines, benzodiazepines, and cannabinoids. Hanson testified the concentration of alcohol in Candace's urine was .338 grams per 100 milliliters. The following exchange then occurred between Hanson and the prosecutor:

> Q.    … And .338, can you tell the jury how that compares to the blood alcohol content required for an operating while intoxicated charge in the State of Wisconsin?
>
> A.    The legal limit for driving is .08.
>
> Q.    So is this then roughly four times the legal limit for operating while intoxicated for a blood alcohol content?
>
> A.    Yes, it is.

....

Q.      Okay. Would you expect a person with a .338 level of ethanol in their blood to be intoxicated?

A.      Yes, I would expect a person with a .338 to be significantly impaired.

¶10      Michelle Lear, a detective with the Superior Police Department, testified that she interviewed Bunten a few weeks after Candace reported the assault. An audio recording of that interview was played for the jury at trial. During the interview, Bunten denied having any sexual contact with Candace. He told Lear that on the date of the alleged assault, he had been at Candace's apartment with two other people, but he left at the same time as those individuals and did not return.

¶11      Michelle Rusch, a forensic scientist from the Wisconsin State Crime Laboratory, testified that she tested the genital swabs obtained from Candace during the SANE examination. Rusch explained that, although the swabs tested negative for semen, male DNA was detected on the anal, perineum, and oral swabs. Rusch testified a DNA sample obtained from Bunten was consistent with the male DNA on those swabs.

¶12      Bunten testified in his own defense and was the only defense witness at trial. He testified Candace called him on January 2, 2012, and asked if he had any methamphetamine. Bunten then went to Candace's apartment, where he smoked methamphetamine with Candace, Monica, and Richard. At some point, Candace joined Bunten in the bathroom and suggested that he return to her apartment later to have sex. Bunten testified that after he and the Edquists left the apartment, he pretended he had forgotten something and went back to Candace's door. After Candace let him into the apartment, they smoked more

5

methamphetamine and started kissing in the kitchen, and they ultimately had sex in Candace's bedroom. When asked to describe Candace's condition, Bunten said "it was 50-50. She was high and she was drunk." He admitted he had lied during his interview with Lear, but he stated he had just had a baby with his girlfriend and was scared she would leave him if she learned the truth.

¶13 The jury found Bunten not guilty of burglary and second-degree sexual assault by use of force, but guilty of second-degree sexual assault of an intoxicated person incapable of giving consent. The circuit court sentenced Bunten to five years' initial confinement and fifteen years' extended supervision.

¶14 Bunten moved for postconviction relief, arguing his trial attorney was ineffective by failing to adequately cross-examine Hanson, the State's toxicologist, and by failing to retain a toxicologist to testify for the defense. Bunten also argued his trial counsel was ineffective by failing to investigate and call Candace's niece Laura and another woman, Susan Pearson, as witnesses at trial. Bunten asserted that both Laura and Pearson "would have testified that [Candace] told them the sexual assault never happened." In addition, Bunten argued he was entitled to a new trial based on newly discovered evidence. He claimed that after the guilty verdict, he learned that Charles Norton, a former boyfriend of Monica Edquist, had "overheard an argument between [Candace] and Monica where Monica told [Candace] that she did not like that she was going to put an innocent man in jail."

¶15 The circuit court held an evidentiary hearing on Bunten's postconviction motion, during which Bunten presented the testimony of his trial counsel; Anne Manly, an expert toxicologist; Laura; a defense investigator; and Norton. Bunten also testified on his own behalf. The court questioned some of

6

Bunten's witnesses, including Manly. Bunten then filed a motion for recusal, arguing the court's questioning of Manly demonstrated objective bias. The court denied Bunten's recusal motion, stating it had reviewed the transcript of Manly's testimony and did not see any evidence of bias.

¶16    The circuit court subsequently denied Bunten's postconviction motion. In its oral ruling, the court held that Bunten's trial attorney did not perform deficiently in his cross-examination of Hanson, and that his failure to retain an expert toxicologist was neither deficient nor prejudicial. The court also held that counsel did not perform deficiently or prejudice Bunten's defense by failing to call Pearson or Laura as witnesses. Finally, the court stated Norton's testimony that Monica said she did not want to put an innocent man in jail would not have had "any impact" on the only count on which Bunten was convicted—second-degree sexual assault of an intoxicated person incapable of giving consent. Bunten now appeals.

## DISCUSSION

### I. Ineffective assistance

¶17    Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently. *Id.*

¶18    To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance

prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697.

¶19 To prove deficient performance, a defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. We are "highly deferential to the reasonableness of counsel's performance." *State v. Jenkins*, 2014 WI 59, ¶36, 355 Wis. 2d 180, 848 N.W.2d 786, *reconsideration denied*, 2015 WI 1, 360 Wis. 2d 178, 857 N.W.2d 620.

¶20 To demonstrate prejudice, the defendant must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The *Strickland* prejudice test is "distinct from a sufficiency of the evidence test," and a defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar,* 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89. However, while a defendant "need not prove the jury *would have* acquitted him ... he must prove there is a *reasonable probability* it would have, absent the error." *Id.*, ¶46.

*A. Failure to adequately cross-examine Hanson and retain an expert toxicologist for the defense*

¶21 Bunten first argues that his trial attorney was ineffective by failing to adequately cross-examine Hanson, the State's toxicologist, and by failing to retain an expert toxicologist to testify for the defense. Bunten's argument in this regard

is based on an error that Hanson made during her trial testimony. Hanson testified that the concentration of alcohol in Candace's urine was .338 grams per 100 milliliters. However, upon further questioning, Hanson then compared that concentration to a *blood* alcohol concentration of .08 grams per 100 milliliters—the legal limit for operating a motor vehicle in Wisconsin. Specifically, Hanson testified that the concentration of alcohol in Candace's urine was approximately four times the legal limit for operating a motor vehicle. Hanson further testified that she would expect a person with a ".338 level of ethanol in their blood" to be "significantly impaired."

¶22 During the postconviction hearing, Bunten's expert toxicologist—Manly—testified that a urine alcohol concentration measured in grams per 100 milliliters cannot be compared to a blood alcohol concentration measured in grams per 100 milliliters. In order to compare the two concentrations, the urine alcohol concentration must be converted to a measurement of grams per 75 milliliters. Manly testified that the concentration of alcohol in Candace's urine sample was .25 grams per 75 milliliters. Thus, rather than being approximately four times the legal limit for operation of a motor vehicle, Candace's urine alcohol concentration was only three times the legal limit. Bunten argues his trial attorney should have called attention to this discrepancy during his cross-examination of Hanson or should have retained an expert toxicologist to testify regarding the proper comparison of Candace's urine alcohol concentration and a .08 blood alcohol concentration.

¶23 Regardless of whether Bunten's trial attorney performed deficiently in these respects, we conclude Bunten has failed to demonstrate that counsel's alleged errors prejudiced his defense. There was ample evidence at trial from which the jury could make the required findings that: (1) Candace was so

intoxicated as to be unable to consent to sexual activity; and (2) Bunten had actual knowledge that Candace was incapable of giving consent. *See* WIS JI—CRIMINAL 1212 (2014). Candace testified that she had consumed approximately thirty beers on the day of the assault, as well as smoking marijuana and methamphetamine. The toxicology report confirmed the presence of alcohol, amphetamines, methamphetamines, benzodiazepines, and cannabinoids in Candace's urine. Candace also testified she was so impaired prior to the assault that she passed out.

¶24 In addition, the responding officer, the SANE, and Candace's sister each testified that Candace appeared intoxicated following the assault. Bunten himself testified that Candace was "high and … drunk" that day and described her condition as "50-50." Given all of this evidence, it is not reasonably probable that the jury's verdict would have been different had Bunten's trial counsel clarified— either by cross-examining Hanson or by introducing the testimony of a defense expert—that the concentration of alcohol in Candace's urine was only three times the legal limit rather than four.

¶25 Bunten also argues that an expert toxicologist "would have been able to opine that [Candace] could have appeared to have been engaging in the sexual encounter voluntarily and with consent." However, the circuit court indicated during the postconviction hearing that it would not have permitted expert testimony on that point. The court explained that a defense expert would have been able to testify as to "the difference" in ethanol concentrations but could not have testified as to how Candace would have appeared because such testimony would have been mere "speculation."

¶26 The circuit court's decision to exclude Bunten's proposed expert testimony would not have been an erroneous exercise of discretion. *See State v.*

10

***Shomberg***, 2006 WI 9, ¶10, 288 Wis. 2d 1, 709 N.W.2d 370 (circuit court's decision to exclude evidence is reviewed for an erroneous exercise of discretion). "Expert opinion testimony on an ultimate fact is permissible, even where the evidentiary facts on which the ultimate fact in issue depends are in dispute, *so long as the opinion on the ultimate fact is given using a hypothetical case or situation*." ***State v. LaCount***, 2008 WI 59, ¶21, 310 Wis. 2d 85, 750 N.W.2d 780 (emphasis added). Here, Bunten argues a defense toxicologist would have testified that Candace could have appeared capable of consenting to sexual activity. Such an opinion, however, would not have been based upon "a hypothetical case or situation." *See* ***id.*** Accordingly, trial counsel's failure to call an expert witness to present such testimony did not prejudice Bunten's defense, as the circuit court would have properly excluded the proffered testimony.[2]

### B. Failure to investigate and call Laura and Pearson as witnesses

¶27    Bunten also argues his trial attorney was ineffective by failing to investigate and call Laura and Pearson as witnesses at trial. According to the evidence presented at the postconviction hearing, both women would have testified that sometime after Candace reported the assault, Candace called Laura to apologize and indicated that she had lied about Bunten sexually assaulting her.

¶28    We conclude Bunten's trial attorney did not fail to investigate these witnesses and did not perform deficiently by failing to call them. At the

---

[2] Bunten asserts the circuit court exhibited bias when it concluded that a defense expert could not have testified regarding whether Candace could have appeared capable of giving consent because the court permitted Hanson to present the same "type of analysis." Bunten is incorrect. Hanson testified, as a general matter, about the ways in which a high alcohol concentration can impair a person. Bunten does not point to any portion of the trial transcript in which Hanson opined as to whether Candace could have appeared capable of giving consent on the day of the assault.

postconviction hearing, counsel explained that he had "intended to have [Laura] testify to the conversation she had with [Candace] where [Candace] essentially retracted." However, during her trial testimony, Candace explained that she had complained to detective Lear because Laura was repeatedly calling her and harassing her about the assault, and Lear instructed Candace "to tell them that I … wanted to drop charges just so that they would quit harassing me and for my own protection." Counsel explained that, in light of Candace's explanation, he decided not to call Laura as a witness because "the State had effectively negated the impact" of her testimony. Counsel further testified that he decided not to call Pearson as a witness because her account of the telephone conversation lacked details and he felt she was a "really weak witness."

¶29 This testimony shows that Bunten's trial attorney did, in fact, investigate whether to call Laura and Pearson as witnesses at trial. However, he ultimately made the strategic decision not to call them to testify, based on Candace's trial testimony and his belief that Pearson was not a strong witness. Bunten argues counsel's strategy was unreasonable because Laura and Pearson would have testified that Candace approached Laura to recant, as opposed to Laura contacting Candace. This perceived distinction is immaterial. Candace testified at trial that she felt harassed by Laura and, based on Lear's advice, she therefore told Laura that Bunten did not assault her. Candace never testified that the recantation occurred during a phone call or conversation initiated by Laura. Thus, her testimony was not inconsistent with Laura's and Pearson's accounts of the recantation. Given Candace's testimony, counsel's strategic decision not to call Laura and Pearson as witnesses was reasonable. An attorney's reasonable trial strategy is "virtually unassailable in an ineffective assistance of counsel

12

analysis." ***State v. Reinwand***, 2019 WI 25, ¶41, 385 Wis. 2d 700, 924 N.W.2d 184 (citation omitted).

## II.  Newly discovered evidence

¶30    Bunten next argues that he is entitled to a new trial based on the existence of newly discovered evidence—specifically, Norton's testimony that he overheard Monica telling Candace that Monica "did not like that she was going to put an innocent man in jail."  We review a circuit court's decision on a motion for a new trial based on newly discovered evidence for an erroneous exercise of discretion. ***State v. Avery***, 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60.  To obtain a new trial on this basis, a defendant must prove that:  (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. ***Id.***, ¶25.  If the defendant makes this showing, the court must then determine whether there is a reasonable probability that a new trial would produce a different result. ***Id.***  This latter determination is a question of law. ***State v. Plude***, 2008 WI 58, ¶33, 310 Wis. 2d 28, 750 N.W.2d 42.

¶31    Here, Bunten has failed to establish the third element of the newly discovered evidence test—i.e., that Norton's testimony is material to an issue in the case.  Again, in order to convict Bunten of second-degree sexual assault of an intoxicated person, the State needed to prove that Candace was so intoxicated that she was unable to consent to sexual activity and that Bunten had actual knowledge that Candace was incapable of giving consent. *See* WIS JI—CRIMINAL 1212 (2014).  Monica was not present in Candace's apartment at the time of the assault.  She therefore had no knowledge as to whether Candace was able to consent to sex at that time or whether Bunten knew that Candace was incapable of giving

consent. Any statement Monica may have later made expressing concern about convicting an innocent man was therefore immaterial to the issues the jury needed to decide. As such, Norton's testimony regarding Monica's statement provides no basis to grant Bunten a new trial.

### III. New trial in the interest of justice

¶32 In the alternative, Bunten asks us to grant him a new trial in the interest of justice. Under WIS. STAT. § 752.35, we have authority to grant a new trial in the interest of justice if it appears that: (1) the real controversy has not been fully tried; or (2) it is probable that justice has for any reason miscarried. We exercise our power of discretionary reversal under § 752.35 "sparingly and only in the most exceptional cases." *State v. Schutte*, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469.

¶33 Bunten argues he is entitled to a new trial in the interest of justice based on the cumulative effect of his trial attorney's alleged errors and Norton's new evidence. However, we have already rejected each of Bunten's ineffective assistance claims, and we have also concluded that the circuit court did not err by denying his motion for a new trial based on newly discovered evidence. Adding these arguments together adds nothing. "Zero plus zero equals zero." *Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976). Bunten has failed to convince us that this is the sort of "exceptional" case warranting discretionary reversal. *See Schutte*, 295 Wis. 2d 256, ¶62.

**IV. Judicial bias**

¶34 Finally, Bunten argues that the circuit court exhibited judicial bias during the postconviction hearing, and we should therefore reverse the order denying postconviction relief and remand for a new postconviction hearing before a different judge. "The right to an impartial judge is fundamental to our notion of due process." *State v. Goodson*, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385. Whether a judge was unbiased is a question of constitutional fact that we review independently. *State v. Neuaone*, 2005 WI App 124, ¶16, 284 Wis. 2d 473, 700 N.W.2d 298. We presume that a judge has acted fairly, impartially, and without bias. *Goodson*, 320 Wis. 2d 166, ¶8. The party asserting judicial bias has the burden to show, by a preponderance of the evidence, that the judge was biased or prejudiced. *Neuaone*, 284 Wis. 2d 473, ¶16.

¶35 Judicial bias may be either subjective or objective. *State v. Gudgeon*, 2006 WI App 143, ¶20, 295 Wis. 2d 189, 720 N.W.2d 114. "Judges must disqualify themselves based on subjective bias whenever they have any personal doubts as to whether they can avoid partiality to one side." *Id.* Here, the circuit court expressly found that it was not subjectively biased. As Bunten concedes, the court's finding to that effect ends the subjective bias inquiry. *See State v. Walberg*, 109 Wis. 2d 96, 106, 325 N.W.2d 687 (1982).

¶36 We therefore turn to the issue of whether the circuit court was objectively biased. Objective bias can exist in two situations: (1) where there is an appearance of bias or partiality; and (2) where objective facts demonstrate that a judge treated a party unfairly. *Goodson*, 320 Wis. 2d 166, ¶9. The appearance of bias or partiality constitutes objective bias when a reasonable person could

15

conclude "that the average judge could not be trusted to 'hold the balance nice, clear, and true' under all the circumstances." *Id.* (citation omitted).

¶37   In this case, Bunten argues the circuit court exhibited objective bias during the postconviction hearing when it "usurped the role of the district attorney" while questioning Manly.  Bunten contends that the court improperly attempted to "impeach[]" Manly's credibility, that it "interrupted" her approximately six times, and that it "was confrontational, argumentative and acted as adversary counsel in its cross-examination of her."

¶38   After reviewing the postconviction hearing transcript, we conclude Bunten has failed to overcome the presumption that the circuit court was unbiased. *See Goodson*, 320 Wis. 2d 166, ¶8.  A circuit court has statutory authority to question witnesses.  WIS. STAT. § 906.14(2).  To be sure, when exercising this authority, a court must be careful not to function as a partisan or an advocate. *State v. Asfoor*, 75 Wis. 2d 411, 437, 249 N.W.2d 529 (1977).  However, a judge "is more than a mere referee." *Id.*  In fact, a judge has "a right to clarify questions and answers and make inquiries where obvious important evidentiary matters are ignored or inadequately covered" by the parties. *Id.*  This right is of particular importance when the judge is acting as the trier of fact, as was the judge at this postconviction hearing when determining whether trial counsel's performance was deficient.

¶39   The circuit court's questioning of Manly during the postconviction hearing did not cross the line into advocacy.  The court inquired as to: (1) the difference between the various alcohol concentrations at issue in the case; (2) the presence of other drugs in Candace's urine; (3) research regarding the effects of different levels of methamphetamine and marijuana on users; and (4) if Manly

16

could have given an opinion as to whether Candace was capable of consenting to sexual intercourse at the time of the assault. The court's questions were directly relevant to the issues raised in Bunten's postconviction motion.

¶40 Contrary to Bunten's assertion, the manner in which the circuit court questioned Manly also fails to demonstrate objective bias. Bunten asserts that the court was confrontational and argumentative when questioning Manly, and that it repeatedly interrupted Manly and improperly raised its voice. While we appreciate Bunten's argument that the transcript of the postconviction hearing may not fully reflect the tenor of the court's questioning, our review of the transcript does not indicate that the court was inappropriately confrontational or argumentative. Furthermore, the court explained during its oral ruling on Bunten's recusal motion that Manly's testimony by speakerphone caused certain difficulties, which resulted in the court and Manly interrupting and speaking over each other at times and the court needing to raise its voice in order to be heard. Bunten does not cite any evidence calling into question the court's explanation. In his reply brief, Bunten asserts that the court improperly "cut off" Manly's testimony and "didn't let her finish." However, the record shows that the court appropriately ended its questioning of Manly after concluding that it would not receive any additional helpful testimony from her.

¶41 Bunten complains that a party can never successfully raise a judicial bias challenge because it is the circuit court judge who "make[s] his own factual findings of his own recollection of his own candor and statements." While that is true of subjective bias, *see **Walberg***, 109 Wis. 2d at 106, this court independently determines whether a judge was objectively biased, *see **Neuaone***, 284 Wis. 2d 473, ¶16. Notably, we have recently found objective bias in two cases in which the respective circuit court judges concluded their own actions did not demonstrate

17

bias. *See **Miller v. Carroll***, 2019 WI App 10, ¶¶1-2, 11, 386 Wis. 2d 267, 925 N.W.2d 580; ***State v. Lamb***, No. 2017AP1430-CR, unpublished slip op. ¶¶1, 8 (Sept. 25, 2018).

¶42 Bunten asserts that in this case, the circuit court should not have been permitted to opine that difficulties with the speakerphone were to blame for the court interrupting Manly and raising its voice. Yet, as noted above, Bunten cites no evidence disputing the court's explanation that the speakerphone caused those difficulties. Under these circumstances, the record does not support Bunten's judicial bias claim.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.